## In re ADOPTION OF STOWE.
### No. 60 C 1268.

Circuit Court, Dade County.
July 11, 1960.

John B. Orr, Jr., Miami Beach, for petitioners.

Quentin T. Eldred, Miami, for respondents.

ROBERT L. FLOYD, Circuit Judge.

This cause came on to be heard before the court on July 7, 1960, in chambers, upon the petition for adoption filed February 9, 1960 by William Moore and Leola Moore, his wife, for the adoption of Thomas John Stowe, Jr., a minor, and the objections to petition filed May 31, 1960, by Thomas John Stowe, Sr., and Patty Stowe, his wife, the natural parents of the child. The court heard the testimony of the petitioners and their witnesses, and the testimony of the natural parents and their witnesses and after considering said testimony, makes the following findings —

Thomas John Stowe, Sr. (age 21) and Patty Stowe (age 17) were married in Baltimore, Md., on March 17, 1959. The infant child, subject matter of this litigation, was born unto them on August 9, 1959, in Baltimore. Shortly after the birth of the child domestic difficulties arose between the parents and as a result

thereof Patty Stowe took the infant child and came to Miami with her aunt and uncle on or about October 27, 1959. She did not notify her husband where she planned to go, nor did she advise him of her intentions to depart. In an effort to locate her, the husband advertised in the Baltimore newspapers and notified the police department there. His efforts, however, proved of no avail.

Patty remained in Miami with her aunt and uncle for one week and sought employment. She worked in a toy shop for a period of one week but had to give up this position and found herself without sufficient funds to care for herself and her infant child. Through a chance acquaintance, she met one Mary Jane Johnson, a lady who arranges for the care of unwed mothers. Mrs. Johnson arranged to have Patty and the child live with Mr. and Mrs. William R. Bensch. Mr. and Mrs. Bensch, ages 23 and 25 respectively, grew very fond of the child and in November 1959 had become so attached to the child that they discussed the adoption of the child with a local attorney. Patty was quite agreeable to the adoption, telling them that she did not want the child and that it would be a burden upon her. The attorney, however, advised the Bensches against the adoption, principally because their identity was known to Patty, who might subsequently desire to see the child and otherwise create an untenable situation. Nothing further was said about adoption by the Bensches and they reconciled themselves that such was not possible by them.

Through a mutual friend Mrs. Leola Moore learned of the child's existence and arrangements were made that Mrs. Moore, in the company of another lady, visit the child and his mother at the Bensch home. This occurred on the morning of December 23, 1959. Mrs. Moore used an assumed name and represented to Patty that she knew of a couple who were desirous of adopting the child. The objectors contend that Mrs. Moore represented herself to be a welfare worker, but this is not substantiated by other witnesses. It is evident from the testimony that the only purpose of Mrs. Moore's use of an assumed name was to keep Patty from learning her true identity as the proposed adopting parent. Patty was uncertain as to whether she desired to have the child adopted and it is true that Mrs. Bensch endeavored to persuade her that adoption would be for the best interest of the child.

In any event, on the evening of December 23, 1959, Patty accompanied Mrs. Moore and another friend together with the minor child to the office of William Humphreyes, an attorney. Mr. Humphreyes testified that he fully explained the effect of a consent by the natural mother and that they remained in his office for about an hour and a half on that evening. He testified

that most of this time was taken up by Patty's insistence on telling him her life story. He also testified that he was well aware that the whereabouts of the natural father was not known by him and that he advised Patty that the consent of the father would be necessary because the child had been born in wedlock. After the consent had been signed by Patty on December 23, 1959, Mrs. Moore and her friend returned Patty and the baby to the Bensch home at which place the baby's clothing was gathered and the baby delivered to Mrs. Moore that night.

In the meantime, on or about December 21, 1959, Patty had called her husband in Baltimore. She failed to reach him personally, but told his mother of her whereabouts. Mr. Stowe ("Thomas" hereafter), failing to call her back, took the next bus from Baltimore and reached Miami on the morning of December 24, 1959. He confronted his wife and wanted to know where the baby was and when told that she had signed an adoption consent he became very angry. He called Mr. Humphreyes, the attorney, and demanded the return of the child and testified that Mr. Humphreyes assured him that the child would be returned by noon December 24, 1959. Mr. Humphreyes in his testimony denied any such statement although he admits he received a call from Thomas that morning. Mr. and Mrs. Stowe further testified that when the child was not delivered to them at noon on December 24th, they tried to contact Mr. Humphreyes by phone but that they were unsuccessful. In any event, they testified that they took a ride and that they contacted a Lutheran minister and discussed with him their problem. This minister did not testify at the hearing. Thomas testified that he thought of a scheme to have his child returned to him and that in furtherance of this scheme he would give his consent to the adoption.

This court cannot, frankly, follow the logic of this testimony, but Thomas stated that it was quite logical to him. In the late afternoon of December 24th, the Stowes told Mrs. Bensch that they were ready and willing to sign consent papers and arrangements were again made with Mr. Humphreyes to meet in his office at 8 o'clock Christmas Eve. Here again Mr. Humphreyes testified that he thoroughly explained the effect of the contents of the consent papers and that Patty was now quite calm and understanding. Those present at this conference testified that there was no coercion or duress used on the Stowes. On the contrary, the witnesses testified that they overheard Mr. Humphreyes explain the contents and ask the questions as to whether or not the Stowes were sure they wanted to sign the adoption papers. This question was asked not only once but about six times.

After the consent papers were signed Mr. Humphreyes wrote out his personal check for $100 to the Stowes at the direction and authorization of Mrs. Leola Moore. Mrs. Moore was not present at the second conference but had authorized Mr. Humphreyes to do this in order to provide funds for the Stowes to return to Baltimore. The objectors contend that this payment is in violation of the adoption statutes of Florida, and the court agrees with this contention. However, it is apparent to the court that this payment was not made contingent upon the signing of the consent papers nor as a condition thereof, but was made because Mrs. Stowe had told Mrs. Moore earlier that resort would have to be made to the Traveler's Aid Society in order to obtain funds to return to Baltimore. The Stowes then returned to the Bensch home, had dinner with the Bensches, and then were taken to the bus terminal where they boarded a bus to Baltimore.

The Stowes testified that they took no action whatsoever for a period of two weeks after returning to Baltimore, but that at that time they went to see the legal aid attorney in Baltimore regarding this matter. No correspondence was directed to anyone advising that they had withdrawn their consent or had had a change of mind in this regard.

In the meantime the infant child remained with the adopting parents Mr. and Mrs. Moore, and on February 9, 1960, a petition for adoption was filed. The objectors contend that their consents were obtained by duress and misrepresentation, and while they were under great emotional strain. It is the opinion of this court that the facts and testimony do not substantiate their theory.

In Florida Jurisprudence, volume 1, page 494, section 16, it is stated — "While the trend of recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption of his or her child and the adoptive parents have accepted and acted, then the consent is ordinarily binding and cannot be withdrawn, this rule is inapplicable where the requisite consent was not freely and knowingly obtained." In 138 A.L.R. page 1038 which annotates In re White's Adoption, 1 N.W. 2d 579, the annotator recites that the majority rule is that a natural parent may withdraw his or her consent to a proposed adoption at any time before the rights of the adopting parents become vested, and for any reason whatsoever. However, this annotation is supplemented by the annotation appearing in 156 A.L.R. 1011, annotating a decision by the United States Court of Appeals for the District of Columbia, reported at 144 Fed. 2d 644, and states that the trend of the more recent authority is toward the position that where a natural parent has

freely and knowingly given the requisite consent to the adoption of his or her child, and the proposed adoptive parents acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parents and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption. It further points out that this is particularly true where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a "vested right", have been forged between them and the child.

In Florida the Supreme Court has held in Petition of Gaban, 30 So. 2d 176, that the consent must be freely and voluntarily given. The court reversed its first decision and held that even under the circumstance existing in that case — which in this court's opinion are much stronger in favor of the natural mother than in the case at bar — such circumstances did not vitiate the consent, and affirmed the lower court's decree of adoption. See also In re McDaniel, 35 So. 2d 585, and Lambert v. Taylor, 8 So. 2d 393.

This court concludes that under all the circumstances surrounding the obtaining of the consent of both parents there is not shown sufficient evidence to vitiate the consents or to warrant setting them aside. The adopting parents have now become attached to the infant child, are well able to care for him, and have acted in good faith and with good motives. They relied upon the consent given them by the natural parents and the child is developing well under their care. The natural father's explanation of why he gave his written consent is not borne out by his testimony. Somewhere between noon December 24, 1959, and the late afternoon of the same day, he agreed to give his consent and later acted upon this change of mind. The welfare board investigation results favorably to the adopting parents. It might be pointed out also that the natural parents are expecting another child in November or December, 1960.

The premises considered it is, therefore ordered, adjudged and decreed —

That the objections filed by the natural parents to the petition for adoption are denied.

That the petition for adoption by William Moore and Leola Moore of the minor child, Thomas John Stowe, Jr., is granted, and the court finds that the petitioners are fit and proper persons to adopt said child, that the best interests of the child will be promoted by such adoption and that the child shall hereafter

be a legal heir of the said petitioners, entitled to all right and privileges and subject to all obligations of a child born to them in lawful wedlock.

That the said minor child shall hereafter be known under the name of Philip Dean Moore.

That the costs of these proceedings shall be born by the petitioners.